United States District Court
Southern District of Texas
**ENTERED**
October 21, 2026
Nathan Ochsner, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| ARTIE BROOKS,<br>(TDCJ # 00836222),<br><br>*Petitioner*,<br><br>vs.<br><br>ERIC GUERRERO, Executive Director of TDCJ-CID<br><br>*Respondent*. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | CIVIL ACTION NO. H-26-4384 |

## MEMORANDUM OPINION AND ORDER

The petitioner, Artie Brooks, is a state inmate in custody at the Stiles Unit of the Texas Department of Criminal Justice–Correctional Institutions Division. Through counsel, he filed a petition for writ of habeas corpus under 28 U.S.C. § 2254, seeking to challenge his 1998 murder conviction. (Dkt. 1). The respondent answered with a motion to dismiss. (Dkt. 6). Brooks filed a timely response. (Dkt. 7). After reviewing the petition, the motion and response, the state-court records, and the applicable law, the Court dismisses Brooks's action as barred by limitations.

# I. BACKGROUND

## A. Procedural Background

On July 16, 1998, the 262nd District Court sentenced Brooks to life in prison after a jury found him guilty of murder with a deadly weapon in Harris County Cause Number 773263. (Dkt. 5-1, pp. 77–78). The Texas First Court of Appeals affirmed the conviction and sentence on July 1, 1999. *See Brooks v. State*, No. 01-98-00830-CR, 1999 WL 442184 (Tex. App.—Houston [1st Dist.] July 1, 1999, pet. ref'd) (*mem. op., not designated for publication*). The Texas Court of Criminal Appeals refused Brooks's petition for discretionary review on October 13, 1999. *Id.* Brooks did not seek further review of his conviction and sentence in the United States Supreme Court. (Dkt. 1, p. 5).

In November 2020, Brooks filed his first application for a state writ of habeas corpus through counsel. (Dkt. 5-15, pp. 5–23). In that application, he alleged that newly discovered evidence showed that the autopsy results of victim Leslie Havard contradicted the testimony of the second victim, Torrez Tyrone Dirden, and established Brooks's actual innocence. (*Id.* at 10–11). He alleged that trial counsel provided ineffective assistance by failing to call the medical examiner who conducted the autopsy to testify at trial, by failing to impeach Dirden's testimony about which hand the shooter used, and by failing to object when the trial court overruled his objection to photos of the deceased victim. (*Id.* at 12–13). Brooks

further alleged that appellate counsel provided ineffective assistance by failing to raise claims concerning the sufficiency of the evidence and the admission of certain photographs. (*Id.* at 14). The state habeas trial court made recommended findings of fact and conclusions of law. (*Id.* at 444–52). The Court of Criminal Appeals denied relief on June 23, 2021, without written order based on the findings of the trial court without a hearing and the court's independent review of the record. (Dkt. 5-16).

On February 24, 2023, Brooks, proceeding *pro se*, filed a second state application for writ of habeas corpus. (Dkt. 5-17, pp. 4–23). He raised a claim of newly discovered evidence based on an alleged confession to the crime by fellow inmate Joseph Redeaux, Jr., and a claim that the State presented false testimony through Dirden concerning whether Brooks was the perpetrator. (*Id.* at 9–12). The Court of Criminal Appeals dismissed the application as a subsequent application under Texas Code of Criminal Procedure article 11.07, § 4(a)–(c) on May 10, 2023. (Dkt. 5-19).

On August 28, 2025, Brooks, through counsel, filed a third state application for writ of habeas corpus. (Dkt. 5-20, pp. 7–25). That application raised the same two claims that had been raised in the February 2023 *pro se* application. (*Id.* at 12–14). The Court of Criminal Appeals dismissed the application as a subsequent application on September 24, 2025. (Dkt. 5-21).

On January 21, 2026, Brooks, through counsel, filed his fourth state application for writ of habeas corpus. (Dkt. 5-23, pp. 4–21). This application alleged that the prosecutor committed a *Brady*[1] violation by failing to disclose a note written by Dirden while he was in the hospital and a *Giglio*[2] violation by failing to correct Dirden's testimony that the assailant used a revolver when the evidence showed that the victims were shot with 9-millimeter ammunition. (*Id.* at 9). It also alleged that trial counsel provided ineffective assistance by failing to investigate discrepancies between the autopsy report and the trial testimony. (*Id.* at 10). Finally, it raised a claim of actual innocence based on Dirden's hospital note, Redeaux's alleged confession, the autopsy report, and the ballistics information. (*Id.* at 12). The state habeas trial court held a non-evidentiary hearing and then recommended denial of the application as a subsequent application. (Dkts. 5-23, pp. 108–10; 5-24, pp. 3–4; 5-27). On April 9, 2026, the Court of Criminal Appeals dismissed the application as noncompliant with Rule 73.1 of the Texas Rules of Appellate Procedure. (Dkt. 5- 28). Brooks's motion for reconsideration was dismissed pursuant to Rule 79.2 of the Texas Rules of Appellate Procedure. (Dkt. 5-30).

---

[1]*Brady v. Maryland*, 373 U.S. 83 (1963).

[2]*Giglio v. United States*, 405 U.S. 150 (1972).

On June 3, 2026, Brooks filed this federal petition for writ of habeas corpus. (Dkt. 1). The petition raises the following issues:

1. The State violated *Brady* by failing to disclose the note written by Dirden that contained impeachment evidence.

2. The State violated *Giglio* by eliciting knowingly false evidence concerning the weapon used in the crime, the locations of the bullet wounds to the victim, and the content of the note written by Dirden.

3. Newly discovered evidence shows that Redeaux committed the murders rather than Brooks, which establishes his actual innocence.

4. Brooks was denied effective assistance of counsel because:

    a. Counsel failed to investigate and use forensic and documentary evidence that contradicted Dirden's testimony.

    b. Counsel failed to impeach Dirden about the type of weapon used.

    c. Counsel failed to impeach Dirden about the location of the bullet wounds.

    d. Counsel failed to use the police report to impeach Dirden about his handwritten note.

    e. Counsel failed to challenge Dirden's perception of the events.

(*Id.* at 9–10). As to the timeliness of the petition, Brooks alleges that it should be considered timely because the hand-written note could not have been discovered until December 2025, when Brooks's brother obtained the investigative file from the Baytown Police Department. (*Id.* at 13). As relief, he asks this Court to vacate his conviction and remand for either further proceedings or his release. (*Id.* at 10).

The respondent answered with a motion to dismiss. (Dkt. 6). The motion contends that Brooks's petition should be dismissed as barred by the statute of limitations applicable to § 2254 petitions. (*Id.* at 10–24). In the alternative, it contends that Brooks's claims should be dismissed as unexhausted. (*Id.* at 25–28).

Brooks filed a timely response to the motion. (Dkt. 7). Rather than addressing the limitations issue, the response raises additional perceived improprieties from the trial and subsequent state habeas proceedings. (*Id.*). The response also contained a request for an evidentiary hearing and a request for sanctions. (*Id.* at 4–5, 16–17).

**B. <u>Factual Background</u>**

The factual background presented at trial was summarized in the State's brief on direct appeal:

> Leslie Havard started dating [Brooks] sometime in the spring of 1997. (RR IV 133). At first [Brooks] came over every day, but eventually things cooled down and the two stopped seeing each other. (RR IV 134–36). [Brooks], however, still called frequently. (RR IV 136). Sometimes Leslie would talk to him and sometimes she wouldn't. (RR IV 136).
>
> In January of 1998, Leslie and her girlfriend Tennille Pratt were at a club when [Brooks] walked up to them and tried to start a conversation. (RR IV 140). Neither girl wanted to talk to him so he walked off, saying "fuck both y'all." (RR IV 139–40).
>
> Two weeks later on January 19th, 1998, Leslie's friend Tyrone Dirden met her at the same club. (RR IV 42, 46). Tennille and some of Tennille's cousins were also there. (RR IV 48). They stayed until a few minutes before closing time, when they all walked out to the parking lot. (RR IV 51). Leslie, Tennille, and Tyrone then sat in Tyrone's pickup and talked. (RR IV 54). As they were talking Tyrone saw [Brooks] standing near his white Camero thirty yards away. (RR

IV 54). Though Tyrone did not know [Brooks], he heard Tennille say "Look, there's Art." (RR IV 54). [Brooks] was leaning on his car, staring at Leslie and Tyrone. (RR IV 56). He was moving his hands like he was trying to get their attention. (RR IV 56). Leslie ignored him. (RR IV 58).

A few minutes later Tyrone and Leslie took Tennille to her car down the street. (RR IV 60). [Brooks] again showed up and started talking to Leslie. (RR IV 60). He questioned her about whether Tyrone was her boyfriend. (RR IV 61). Leslie told [Brooks] Tyrone was just a friend, then told [Brooks] to leave her alone. (RR IV 61). [Brooks] drove off. (RR IV 61).

After leaving the club Tyrone took Leslie to her apartment about 15 minutes away. (RR IV 63). Instead of going inside, the two sat in Tyrone's pickup and talked some more. (RR IV 63). A short while later [Brooks] drove up again, this time in a white four door car. (RR IV 65). [Brooks] backed into a parking spot right next to Tyrone's truck, with his driver's door two feet away from the truck's passenger door, where Leslie was sitting. (RR IV 66).

[Brooks] got out of his car and came to Leslie's window. (RR IV 67). Leslie rolled down her window and told [Brooks] to leave her alone. (RR IV 69). Again she repeatedly referred to [Brooks] as "Art." (RR IV 77). [Brooks] became more and more agitated, and wanted to know why Leslie was with Tyrone. (RR IV 69). Suddenly [Brooks] leaned over into his car, which was only a few feet away. (RR IV 70). When he turned back toward the pickup he was holding a pistol. (RR IV 71).

Leslie told Tyrone that [Brooks] had a gun, and that they should leave because he was crazy. (RR IV 75). Tyrone hesitated, however, because he didn't think they had done anything wrong and assumed [Brooks]'s gun was just a bluff. (RR IV 77). [Brooks] grabbed Leslie through the window of the pickup, shook her, and said "Bitch, don't you know I'll kill you." (RR IV 77). Tyrone got out of his truck and came around to where [Brooks] was standing, trying to calm him down. (RR IV 80). [Brooks] told him to "get out of my face." (RR IV 81). Leslie also got out of the truck on the driver's side and came around to talk to [Brooks]. (RR IV 83).

[Brooks] pointed the gun first at Leslie, then turned it on Tyrone. (RR IV 84). The two stared at each other for a few seconds, then Tyrone turned to walk away. (RR IV 84). At that same moment

> [Brooks] shot him, hitting him in the throat from a mere six feet away. (RR IV 84). Tyrone fell to the ground, helpless. (RR IV 85). As he lay on his left side he watched [Brooks] walk up to Leslie, who was also on the ground, pick her up "like a little baby in his arms" and shoot her in the head. (RR IV 87). [Brooks] then got in his car and drove off. (RR IV 87).
>
> Cherie Herring, who lived in a nearby apartment, was woken up by Leslie's screaming at 3:00 in the morning. (RR IV 13). The screaming was immediately followed by three gunshots. (RR IV 13). Herring rushed to her window in time to see a white Chevy Cavalier with its lights off drive out of the parking lot. (RR IV 14–15).
>
> After a few minutes Tyrone managed to get up and summon help. (RR IV 94). Herring's husband called the police, who arrived within minutes. (RR III 19, IV 16–17). Tyrone could not talk with all the blood in his mouth, but was able to write [Brooks]'s first name, "Art," on a piece of paper given to him by police. (RR IV 94). Leslie's roommate Tennille arrived home at this time, and she too named [Brooks] as the most likely suspect. (RR III 24, IV 149).
>
> Leslie and Tyrone were both taken away by Lifeflight. (RR III 22). While Tyrone recovered, Leslie died later that morning. (State's Exhibit No. 13).
>
> Within hours of the shooting, police went to [Brooks]'s home where he lived with his grandmother. (RR IV 29). There they found a car matching the description of the vehicle seen driving away from the shooting. (RR IV 29). Tyrone also identified [Brooks] from photos while in the hospital. (RR IV 97). [Brooks], however, was not arrested until the next day, after he hired a lawyer and turned himself in. (RR IV 249–50).

(Dkt. 5-10, pp. 7–10).

## II. DISCUSSION

### A. Statute of Limitations

Brooks's petition is governed by the provisions of the Antiterrorism and Effective Death Penalty Act, Pub. L. No. 104-132, 110 Stat. 1214 (1996)

("AEDPA"), which contains a one-year limitations period. *See* 28 U.S.C. § 2244(d). That one-year period runs from the latest of four accrual dates:

> (A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;
>
> (B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;
>
> (C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or
>
> (D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

28 U.S.C. § 2244(d)(1). Limitations is an affirmative defense, which the respondent properly raised in his motion.

Brooks's time to file a federal habeas petition challenging his conviction and sentence began to run on "the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review." 28 U.S.C. § 2244(d)(1)(A). The pleadings and matters of record show that Brooks's conviction became final for purposes of federal habeas review on January 11, 2000, when the 90-day time to seek review of his conviction in the United States Supreme

Court expired. *See Roberts v. Cockrell*, 319 F.3d 690, 694 (5th Cir. 2003) ("[A] state prisoner's conviction becomes final for purposes of § 2244 ninety days after the judgment is entered, when the time to file a petition for writ of certiorari with the Supreme Court has expired."); *see also* SUP. CT. R. 13(1) (a petition for a writ of certiorari is due within 90 days of the entry of an order denying discretionary review by the state court of last resort). The deadline for Brooks to file a timely federal habeas petition was one year later, on January 11, 2001. Brooks's federal petition, filed June 3, 2026, falls well outside the limitations period and is time-barred unless he can show that a statutory or equitable exception to the limitations period applies.

Under 28 U.S.C. § 2244(d)(2), the time during which a properly filed application for state habeas relief or other collateral review is pending is not counted toward the limitations period. *See Artuz v. Bennett,* 531 U.S. 4, 5 (2000). But a state habeas application filed after the federal limitations period has expired does not extend an already expired limitations period. *See Scott v. Johnson*, 227 F.3d 260, 263 (5th Cir. 2000). Brooks filed his first state habeas application in November 2020, more than twenty years after the federal limitations period had expired. His second, third, and fourth applications were likewise filed long after the federal limitations period had expired. These belated state habeas applications did not restart the already expired federal limitations period. Brooks's federal habeas petition is thus time-barred unless another statutory exception applies.

Brooks does not contend that his petition is timely under either § 2244(d)(1)(B) based on unconstitutional state action or § 2244(d)(1)(C) based on a newly recognized constitutional right. Instead, he contends that his petition should be considered timely under 28 U.S.C. § 2244(d)(1)(D) because the factual basis for his claim based on Dirden's handwritten note "could not have been discovered" before December 19, 2025, when Brooks's brother obtained the note from the Baytown Police Department's file. (Dkt. 1, p. 13).

But in the context of a *Brady* claim, the limitations period does not start with the discovery of the evidence itself; it instead starts with the discovery that evidence was withheld. *See In re Davila*, 888 F.3d 179, 189 (5th Cir. 2018) (holding that the time under § 2244(d)(1)(D) begins to run on "the date a petitioner is on notice of the facts which would support a claim, not the date on which the petitioner has in his possession evidence to support his claim" (quoting *In re Young*, 789 F.3d 518, 528 (5th Cir. 2015))). The limitations period is not extended while the petitioner attempts to gather evidence to support his claim. *See Flanagan v. Johnson*, 154 F.3d 196, 199 (5th Cir. 1998).

In this case, Brooks heard testimony at trial that Dirden wrote a note at the scene that allegedly identified Brooks as the shooter, and Dirden gave that note to a Baytown police officer. (Dkt. 5-5, p. 94). Brooks also knew by the end of trial that no physical note had been introduced into evidence or otherwise produced by the

State. To the extent that he questioned the content or existence of the note, the factual predicate for his claim, i.e., the existence of a note written by Dirden and given to a Baytown Police officer, was known to Brooks no later than the end of his trial in 1998. As of that date, Brooks was on notice of the facts that would support his alleged *Brady* claim, thus triggering the start of the limitations period.

As to his claim that the note "could not have been discovered" before 2025, Brooks offers nothing to support his claim. He alleges that his brother went to the Baytown Police Department in December 2025, requested the file from public records supervisors, and found the note in the file. (Dkt. 1-1, p. 5). But Brooks offers no explanation for the quarter-century delay in even attempting to obtain the police file, and he cannot show that the note could not have been timely discovered within the limitations period. While § 2244(d)(1)(D) does not require that a petitioner act with "the maximum feasible diligence," *see Starns v. Andrews*, 534 F.3d 612, 618 (5th Cir. 2008), it nevertheless requires reasonable diligence, and nothing shows that Brooks's brother could not have obtained the note from the police department in 2000, the same way that he obtained in 2025. Brooks is not entitled to re-start the long-expired statute of limitations by failing to even attempt to obtain the police file for more than twenty-five years.

The fact that Brooks is presenting a *Brady* claim does not change this analysis. A *Brady* claim considers whether prosecutorial misconduct was the reason for the

defendant's failure to discover favorable and material evidence for use *at trial*. *See Davila*, 888 F.3d at 184. But the limitations analysis under § 2244(d)(1)(D) considers whether due diligence during the federal habeas limitations period would have resulted in the discovery of the factual basis for the new claim such that it could have been included *in a timely federal habeas petition*. *Id.* Here, Brooks offers nothing to show that the police report could not have been discovered and obtained during the habeas limitations period through the exercise of due diligence. He is therefore not entitled to extend the limitations period under § 2244(d)(1)(D).

Brooks's petition fails to establish a statutory basis to avoid the effect of the limitations period. His petition is thus time-barred unless an equitable exception applies.

**B. <u>Equitable Tolling</u>**

In some instances, equitable tolling can extend the limitations period. Equitable tolling is an extraordinary remedy that applies only "when strict application of the statute of limitations would be inequitable." *Mathis v. Thaler*, 616 F.3d 461, 475 (5th Cir. 2010) (quoting *In re Wilson*, 442 F.3d 872, 875 (5th Cir. 2006) (per curiam)); *see also Davis v. Johnson*, 158 F.3d 806, 811 (5th Cir. 1998) (equitable tolling applies only "in rare and exceptional circumstances"). A habeas "petitioner is entitled to equitable tolling only if he shows (1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in

his way and prevented timely filing." *Holland v. Florida*, 560 U.S. 631, 649 (2010) (cleaned up) (quoting *Pace v. DiGuglielmo*, 544 U.S. 408, 418 (2005)). The failure to meet the statute of limitations "must result from external factors beyond [the petitioner's] control; delays of the petitioner's own making do not qualify." *In re Wilson*, 442 F.3d at 875. A "garden variety claim of excusable neglect" does not support equitable tolling. *Lookingbill v. Cockrell*, 293 F.3d 256, 264 (5th Cir. 2002). Neither does a lack of knowledge of the law, a misunderstanding of filing deadlines, or status as a layman. *See Felder v. Johnson*, 204 F.3d 168, 171-72 (5th Cir. 2000) (citing cases). And the habeas petitioner has the burden of justifying equitable tolling. *See Holland*, 560 U.S. at 649; *Hardy v. Quarterman,* 577 F.3d 596, 598 (5th Cir. 2009) (per curiam).

Brooks does not contend that he is entitled to equitable tolling, nor do the facts alleged show that he satisfies either requirement for this equitable extension of the limitations period. The facts alleged do not show that he has been diligently pursuing his rights. Indeed, he offers no explanation for his failure to pursue his rights between his conviction becoming final in early 2000 and the filing of his first state application in late 2020. In addition, he offers no facts showing that any factors outside of his control prevented him from pursuing relief. Equitable tolling is not intended to benefit those who sleep on their rights, *see Manning v. Epps*, 688 F.3d

177, 183 (5th Cir. 2012), and Brooks's extended period of inactivity indicates a lack of due diligence.

Because Brooks has failed to satisfy either element necessary to entitle him to equitable tolling, the limitations period will not be extended on this basis. His petition is time-barred unless another equitable exception applies.

### C. **The Actual-Innocence Exception**

A final exception to the AEDPA limitations period arises if the petitioner can show that consideration of his claim is necessary to avoid a fundamental miscarriage of justice. *See McQuiggin v. Perkins*, 569 U.S. 383, 392–94 (2013). Such a fundamental miscarriage may arise when new evidence of a petitioner's actual innocence is discovered after the habeas limitations period has expired. *Id.* Therefore, a claim based on actual innocence may, if proven, excuse a failure to comply with the federal limitations period and provide a "gateway" to review otherwise time-barred claims. *Id.* at 386, 392.

But the actual innocence standard is "demanding." *Id.* at 401. It requires the petitioner to present "new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." *Schlup v. Delo*, 513 U.S. 298, 324 (1995). "[H]owever, . . . tenable actual-innocence gateway pleas are rare: '[A] petitioner does not meet the threshold requirement unless he persuades the district court that, in light of the new

evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt.'" *McQuiggen*, 569 U.S. at 386 (quoting *Schlup,* 513 U.S. at 329); *see also Bosley v. Cain*, 409 F.3d 657, 664 (5th Cir. 2005) (per curiam) ("The *Schlup* standard 'does not merely require a showing that a reasonable doubt exists in the light of the new evidence, but rather that *no reasonable juror* would have found the defendant guilty.'") (emphasis added).

In determining whether the proffered evidence is "new," courts consider whether the evidence was available to the petitioner or his counsel at the time of trial. *See Hancock v. Davis*, 906 F.3d 387, 390 (5th Cir. 2018). "Evidence does not qualify as 'new' under the *Schlup* actual-innocence standard if 'it was always within the reach of [the petitioner's] personal knowledge or reasonable investigation.'" *Id.* (quoting *Moore v. Quarterman*, 534 F.3d 454, 465 (5th Cir. 2008)); *see also Lucas v. Johnson*, 132 F.3d 1069, 1074 (5th Cir. 1998) (evidence whose "essence or character" was available to be presented at trial is not "new" for purposes of an actual-innocence claim).

The court also must consider the reliability of the new evidence. Examples of "reliable" evidence include "exculpatory scientific evidence, credible declarations of guilt by another, trustworthy eyewitness accounts, and certain physical evidence." *Reed v. Stephens*, 739 F.3d 753, 767 (5th Cir. 2014) (quoting *Fairman v. Anderson*, 188 F.3d 635, 644 (5th Cir. 1999)). Further, while there is no requirement that a

habeas petitioner exercise diligence in pursuing relief under the actual-innocence exception, "[a] court may consider how the timing of the submission and the likely credibility of [a petitioner's] affiants bear on the probable reliability of . . . evidence [of actual innocence]." *McQuiggen,* 569 U.S. at 399 (quoting *Schlup*, 513 U.S. at 332). Thus, an "[u]nexplained delay in presenting new evidence bears on the determination whether the petitioner has made the requisite showing." *Id.*

Finally, the new evidence must bear on the petitioner's factual innocence, not the legal insufficiency of the State's evidence. *See Bousley v. United States*, 523 U.S. 614, 623-24 (1998). Thus, the new evidence must be "material, not merely cumulative or impeaching." *Lucas*, 132 F.3d at 1076 n.3; *see also Calderon v. Thompson*, 523 U.S. 538, 563 (1998) (stating that "impeachment evidence provides no basis for finding" actual innocence because "the evidence is a step removed from evidence pertaining to the crime itself").

Brooks relies on four pieces of allegedly new evidence to support his claim under the actual-innocence exception, which will be addressed in turn in light of the principles stated above.

**1. <u>The Redeaux confession</u>**

Brooks alleges that fellow inmate Joseph Redeaux, Jr., confessed to Brooks during the first week of October 2022 that he was the true shooter. (Dkt. 1, p. 10).

Brooks maintains that this constitutes new evidence of his factual innocence. But the alleged confession does not qualify as such.

First, while the evidence may properly be considered "new" as it was not available at trial, questions exist regarding its reliability. As the respondent points out, Redeaux has a lengthy criminal history and is currently serving a fifty-year sentence for aggravated robbery. (Dkt. 6, p. 18). This history could be introduced to impeach his testimony were it to be presented at trial. Redeaux's statement also contains no information that was not presented at trial and thus available either from the trial transcript or Brooks himself. (*Id.* at 18–19). Further, contrary to Brooks's allegations, Redeaux did not give a second "confession" on the record in 2024. Instead, an investigator retained by Brooks read the prior written statement to Redeaux and asked him to confirm whether it was accurate, which Redeaux did. (Dkt. 1-2, pp. 3–7). He is therefore not on the record either making the statement or answering any questions about the events of that evening.

Brooks's lengthy failure to pursue federal habeas relief on this basis also raises questions about the reliability of the alleged confession. *See McQuiggin*, 569 U.S. at 387 (holding that an unjustifiable delay in presenting an actual-innocence gateway claim is "a factor in determining whether actual innocence has been reliably shown"). Brooks offers no explanation for his failure to pursue federal habeas relief based on Redeaux's statement for more than four years after obtaining it, and it

strains credulity to believe that neither he nor counsel would take any action to bring the claim to federal court during this lengthy time if they were convinced of its veracity. All of these factors weigh against finding the alleged third-party confession reliable.

Second, the evidence is material primarily for its impeachment value. At trial, Dirden affirmatively identified Brooks as the person who was at both the club and Leslie's apartment on the night in question, and he affirmatively identified Brooks as the shooter. His testimony was supported by the testimony of Tennille Pratt that Brooks was angry with Leslie, that he was at the club that night, and that he followed them when they left. Redeaux's proffered confession does not negate this testimony or establish Brooks's factual innocence. It instead impeaches Dirden's identification testimony and creates a jury question as to which witness to believe.

When considered in conjunction with all of the testimony presented at trial, Redeaux's testimony might be sufficient to raise a reasonable doubt, but it cannot be said that *no reasonable juror* would find Brooks guilty based on this allegedly new evidence. Redeaux's alleged confession is thus insufficient to satisfy the requirements of the actual-innocence exception so as to allow Brooks to avoid the otherwise applicable limitations period.

**2. <u>The ammunition evidence</u>**

Brooks also alleges that there is "new" evidence that Dirden gave false testimony at trial concerning the firearm used in the shooting. Specifically, he contends that Dirden's trial testimony that the shooter used a revolver is obviously false given that the bullets recovered during Leslie's autopsy were 9-millimeter ammunition. (Dkt. 1-1, p. 14). Brooks appears to contend that only semi-automatic handguns can fire 9-millimeter ammunition, thus "proving" that Dirden's testimony was false. (*Id.*).

Regardless of whether the ammunition evidence could be considered "new," it does not satisfy the *Schlup* standard because the premise is simply incorrect. Multiple revolvers exist that are capable of firing 9-millimeter ammunition. *See, e.g.*, Seven Best 9mm Revolvers: Tested and Ranked, www.usa-gun-shop.com (visited October 16, 2026); *see also Johnson v. Caine*, No. 12-2587, 2014 WL 931377 (E.D. La. Mar. 10, 2014) (discussing 9-millimeter revolvers and noting that "[m]erely because a particular type of weapon is said to be rare or uncommon does not negate the possibility that the defendant possessed such a weapon"); *Thomas v. Warden*, No. 11-cv-2119, 2015 WL 1508432, *10 (W.D. La. Mar. 30, 2015) (rejecting the "assumption that only semi-automatic pistols fire 9 mm projectiles" because "there have long been a number of revolvers manufactured to fire a 9 mm

round"). The fact that the fatal ammunition was 9-millimeter thus does not bear on the question of whether the firearm used was a revolver or a semiautomatic.

Therefore, even assuming the evidence concerning the type of ammunition recovered during the autopsy could be construed as new—a finding the Court does not make—it does not impeach Dirden's trial testimony that the shooter used a revolver nor is it otherwise material to the question of Brooks's guilt or innocence. It therefore does not satisfy *Schlup*'s demanding standard to allow Brooks to bypass the otherwise applicable limitations period.

**3. <u>The hospital note</u>**

Brooks next contends that a hand-written note found during a 2025 review of the Baytown Police file constitutes "new" evidence that the State presented false testimony at trial. Again, this misstates the record.

At trial, Dirden testified that while he was at the scene of the shooting being tended to by EMS personnel, one of the police officers asked if he knew who shot him. (Dkt. 5-5, p. 94). Dirden could not speak because of his injuries, but the officer gave him a piece of paper and Dirden wrote the name "Art" on it. (*Id.*). He was then put into the ambulance before being Lifeflighted to the hospital. (*Id.* at 94–95). Later, at the hospital, he met with a police detective. (*Id.* at 96). At that time, he still could not speak because he had a tracheotomy tube in place. (*Id.*). During that

meeting, he identified Brooks in a photographic line-up. (*Id.* at 96–97). Dirden did not mention writing a second note while at the hospital.

The "new" evidence is in the form of a police report from the Baytown Police Department and another note written by Dirden. That report shows that Officer Daugherty of the Baytown Police Department met with Dirden at the hospital the day after the shooting. (Dkt. 1-3, p. 2). During that meeting, Dirden identified Brooks in a photographic line-up. (*Id.*). Dirden then indicated that he wanted to write something, so Daugherty handed him some paper and Dirden wrote, "How is my other friend?" (*Id.*). Daugherty initialed and dated the note on January 20, 1998, at 12:45 p.m. (Dkt. 1-2, p. 11).

Brooks contends that the report from Daugherty and the note in the police file show that the State presented false evidence at trial about when and where the note was written and what it said. But again, regardless of whether the police report and the note could be considered "new," they do not satisfy the *Schlup* standard. The second note, written at the hospital the day after the shooting, does not contradict or negate Dirden's testimony that he identified Brooks as the shooter in a note written at the scene. At best, the second note could be used to attempt to impeach Dirden's trial testimony, but the differences between where the notes were written, the content of the notes, and the circumstances under which they were written raise serious questions about whether the evidence could even serve as impeachment. Moreover,

as explained above, evidence relevant solely for impeachment will not support a gateway claim of actual innocence. See *Calderon*, 523 U.S. at 563.

Considering these facts, it cannot be said that *no reasonable juror* would find Brooks guilty based on the existence of a second note written on a different date that does not address Brooks and instead involves Dirden asking about Leslie's condition. It therefore does not satisfy *Schlup*'s demanding standard to allow Brooks to avoid the otherwise applicable limitations period.

**4. <u>The autopsy evidence</u>**

Finally, Brooks alleges that the autopsy report shows that Leslie did not have a chest wound, contradicting Dirden's trial testimony that he saw Brooks shoot her in the chest. This evidence is neither new nor sufficiently material to Brooks's guilt or innocence to satisfy the *Schlup* standard.

First, the evidence is not new. The autopsy report was admitted into evidence at trial. (Dkt. 5-8, pp. 30–34). They jury also heard Dirden's testimony that he saw Brooks shoot Leslie in the chest and the head. (Dkt. 5-5, pp. 86–87). Brooks raised the discrepancy between the evidence and the testimony in his first state habeas application. (Dkt. 5-15, pp. 10–11, 445–46). Because the discrepancy could have been, and in fact was, raised not only at trial but also in a prior habeas application, the evidence is not "new" for purposes of an actual-innocence gateway claim.

Second, it cannot be said that the evidence is of such a nature as to show that no reasonable juror would have convicted Brooks had the evidence been presented at trial because the evidence was, in fact, presented at trial. Further, the specific location of the shots is immaterial to Brooks's guilt or innocence and serves only to potentially impeach Dirden's recollection of the shooting. As such, it is insufficient to support a gateway claim of actual innocence. See *Calderon*, 523 U.S. at 563.

Because Brooks has failed to satisfy the demanding *Schlup* standard for actual innocence, he does not establish this as an exception to the federal habeas limitations period. His petition is untimely and will be dismissed as barred by the statute of limitations.

### D. <u>Exhaustion</u>

The respondent's motion contends that even if Brooks's petition were to be considered timely, it should be dismissed because he failed to properly exhaust his state remedies before filing this petition. (Dkt. 6, pp. 25–28). Brooks responds with evidence that he attempted to exhaust his remedies but that defects in the state habeas process prevented him from doing so. (Dkt. 7, pp. 8–11). Because the action is barred by limitations, the Court declines to address the exhaustion issue.

### E. <u>Request for an Evidentiary Hearing</u>

In various pleadings, Brooks has requested that this Court hold an evidentiary hearing on his petition. This request is denied.

Under AEDPA, a habeas petitioner is entitled to have the federal court review new or additional evidence at an evidentiary hearing only when the petitioner shows that:

> (A) the claim relies on-
>
> (i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
>
> (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and
>
> (B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

28 U.S.C. § 2254(e)(2)(A)(ii)–(B). But "even if all of these requirements are satisfied, a federal habeas court still is not *required* to hold a hearing or take any evidence." *Shinn v. Ramirez*, 596 U.S. 366, 381 (2022).

As discussed above, Brooks has failed to present a factual predicate that could not have been previously discovered through the exercise of due diligence or to show that the facts underlying the claim would be sufficient to establish that but for constitutional error, no reasonable factfinder would have found him guilty. More importantly, he is not entitled to an evidentiary hearing on claims that are barred by limitations. His requests for an evidentiary hearing are therefore denied.

### F. Request for Sanctions

Finally, in his response to the respondent's motion, Brooks requests that sanctions be imposed against the respondent based on "documented fraud on the court" arising from the alleged omission of discussion about certain procedural steps and what Brooks contends are misstatements. (Dkt. 7, p. 5–6, 8–9, 19–20). Having reviewed the entire record of all proceedings and the parties' pleadings, the Court denies the request for sanctions as unsupported by the record as a whole.

## III. CERTIFICATE OF APPEALABILITY

Habeas corpus actions under § 2254 require a certificate of appealability to proceed on appeal. 28 U.S.C. § 2253(c)(1); *Miller-El v. Cockrell*, 537 U.S. 322, 335-36 (2003). Rule 11 of the Rules Governing Section 2254 Cases requires a district court to issue or deny a certificate of appealability when entering a final order that is adverse to the petitioner. To be entitled to a certificate of appealability, the petitioner must make "a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), which requires a petitioner to demonstrate "that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Tennard v. Dretke*, 542 U.S. 274, 276 (2004) (quoting *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)). The petitioner must show "that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were 'adequate to

deserve encouragement to proceed further.'" *Miller-El*, 537 U.S. at 336 (quoting *Slack*, 529 U.S. at 484). When the denial of relief is based on procedural grounds, the petitioner must show not only that "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right," but also that they "would find it debatable whether the district court was correct in its procedural ruling." *Slack*, 529 U.S. at 484. A district court may deny a certificate of appealability, *sua sponte*, without requiring further briefing or argument. *See Alexander v. Johnson*, 211 F.3d 895, 898 (5th Cir. 2000) (per curiam).

Because Brooks has not shown that reasonable jurists would find the Court's resolution of the constitutional issues debatable or wrong, this Court will not issue a certificate of appealability.

## IV. CONCLUSION AND ORDER

Based on the foregoing, the Court **ORDERS** as follows:

1. Respondent's motion to dismiss on the basis of the statute of limitations, (Dkt. 6), is **GRANTED.**
2. Brooks's petition for writ of habeas corpus, (Dkt. 1), is **DISMISSED** with prejudice as barred by limitations.
3. Brooks's request for an evidentiary hearing is **DENIED**.
4. Brooks's request for sanctions is **DENIED.**
5. Any other pending motions are **DENIED** as moot.

6. A certificate of appealability is **DENIED.**

7. Final judgment will be separately entered.

The Clerk will send a copy of this order to the parties.

SIGNED at Houston, Texas on Oct. 20, 2026.

DAVID HITTNER
UNITED STATES DISTRICT JUDGE